# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

WHYTWAN VERSEY and
JACQUELINE WASHINGTON,

            Plaintiffs,

v.

CASEY EBERT, JUSTIN JOLLIFF,
ROBERT ROEMBKE, CITY OF
MILWAUKEE, and ROLANDO
FRANCO,

            Defendants.

Case No. 24-CV-1142-JPS

**ORDER**

## 1. INTRODUCTION

In August 2024, Plaintiffs Whytwan Versey ("Versey") and Jacqueline Washington ("Washington") (together, "Plaintiffs") sued Defendants Casey Ebert ("Ebert"), Justin Jolliff ("Jolliff"), Robert Roembke ("Roembke"), the City of Milwaukee (the "City"), and Rolando Franco ("Franco") (together, "Defendants") for unreasonable search and seizure in violation of the Fourth and Fourteenth Amendments of the United States Constitution. *See generally* ECF No. 1-3. Plaintiffs also sued Roembke, Franco, Jolliff, and the City of Milwaukee for failure to intervene. *Id*. In June 2025, Defendants jointly moved for summary judgment as to all counts. ECF No. 16. The motion is now fully briefed. ECF Nos. 20, 23, 27. In July 2025, Defendants moved to exclude testimony by Plaintiffs' expert, Scott J. Hilden. ECF No. 24. That motion is also fully briefed. ECF Nos. 25, 28, 29.

For the reasons discussed herein, the Court will grant Defendants' motion for summary judgment, ECF No. 16, will dismiss this case with

prejudice, and will deny as moot Defendants' motion to exclude testimony, ECF No. 24.

## 2.     LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016) (citing FED. R. CIV. P. 56(a) and *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 978 (7th Cir. 2014)). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The Court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016) (citing *Burritt v. Ditlefsen*, 807 F.3d 239, 248 (7th Cir. 2015)). "At summary judgment a court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence; it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (citing *Anderson*, 477 U.S. at 255). Ultimately, "the non-movant need not match the movant witness for witness, nor persuade the court that her case is convincing, she need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994) (collecting cases). "Summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find

for the non-moving party." *Com. Underwriters Ins. Co. v. Aires Env't Servs., Ltd.*, 259 F.3d 792, 795 (7th Cir. 2001) (citing *Wolf v. N.W. Ind. Symphony Soc.*, 250 F.3d 1136, 1141 (7th Cir. 2001)).

## 3.    RELEVANT FACTS[1]

### 3.1    Initial Arrival and Foot Chase

At around 1:40 a.m., on August 6, 2021, Ebert was dispatched to the corner of 12th Street and West Finn Place to investigate a 911 call about a suspect with a gun. ECF No. 17 at 1. The 911 caller had stated that "three males were outside arguing and that two of them had guns." *Id*. The caller described the appearances of the individuals with guns. *Id*. As relevant here, one of the individuals was described as "a black male, taller than [one of the other individuals], with a white shirt and denim shorts." *Id*. Dispatch relayed to the responding officers that "no shots had been fired, no one was injured, and the argument was not physical." *Id*.

Within one to two minutes, Ebert responded to the scene with his partner, Officer Sosa. *Id*. Upon arrival, Ebert saw an individual matching the above description. The individual appeared to "blade" from Ebert—that is, to "turn his body away from the cruiser so that officers' view of his right side was obstructed." *Id*. Ebert saw a bulge under the individual's shirt on his right side near his waist. *Id.* at 2. Ebert believed, based on his training and experience, that the individual had a firearm. *Id*. He did not personally observe the parties arguing; his attention was focused on the individual. *Id*.

---

[1]In accordance with the Court's Pretrial Order, ECF No. 3, the parties have jointly prepared and submitted a joint statement of undisputed facts, from which the Court draws the below summary. ECF No. 17. Citations to the record will be omitted from the Court's later legal analysis.

Case 2:24-cv-01142-JPS    Filed 03/19/26    Page 3 of 40    Document 30

As soon as Ebert began exiting his police car, the individual—whom the parties agree was now a suspect—fled south on foot through the alley between North 12th Street and North 11th Street. *Id*. Ebert gave chase on foot, ordering the suspect to stop and identifying himself as "Milwaukee Police." *Id*. During the chase, Ebert saw a black gun in the suspect's right hand. *Id*. He broadcasted this observation to other officers. *Id*.

The suspect, now around 20–30 feet in front of Ebert, led Ebert down an alley, at which point the suspect jumped a fence and ran in between two houses—3555 N. 11th St. (the Plaintiffs' home) and 3551 N. 11th St. (a then-abandoned home). *Id*. at 2–3. Ebert's body-worn camera did not record his arrival to the corner of 12th Street, nor did it record the foot chase. *Id*. at 3.

As the suspect ran between the houses, Ebert continued to follow, but he lost sight of the suspect as he exited the path between the houses and turned left on North 11th Street, toward Plaintiffs' residence. *Id*. at 3–4. Ebert did not see the suspect again after the suspect made the turn. *Id.* at 4.

Still tracking what he believed to be the suspect's path, Ebert approached the corner of the Plaintiffs' residence. *Id*. The front entrance to Plaintiff's residence had two doors: a heavy exterior metal door and an inner, main door. *Id*. Before Ebert exited the path between the houses, he heard a metal door open. *Id*. As he completed the turn, Ebert saw the last couple inches of Plaintiffs' metal exterior door closing. *Id*.

Ebert never saw or heard the main interior door open or close, nor did he see the suspect physically enter the residence. *Id.* at 5. By the time Ebert arrived at Plaintiffs' front door, both doors were shut, and Ebert "did not see or hear anything from within the residence indicating that the fleeing subject had entered the home." *Id*. He did not search Plaintiffs'

backyard or any of the neighboring houses before entering Plaintiffs' home. *Id*.

At 1:44 a.m., Ebert broadcasted over the radio that the suspect had run into 3555 North 11th Street.[2] *Id*. Ebert did not force entry until other officers arrived. *Id*.

### 3.2 Entry into Plaintiffs' Residence

Over the radio, Franco ordered officers to force entry when enough officers arrived. *Id*. "Between 1:42 a.m. and 1:48 a.m., officers repeatedly knocked and announced their presence outside." *Id*. Around 1:46 a.m., Jolliff arrived outside Plaintiffs' residence. *Id*. At 1:51 a.m., Franco arrived on-scene, at which point he became the highest-ranking officer present. *Id*. All of the officers who subsequently arrived on scene relied upon Ebert's report of what he observed. *Id*.

Around 1:47 a.m., Ebert propped open the exterior metal door and kicked open the main door. *Id.* at 6. At 1:48 a.m., Ebert, Roembke, "and at least two other officers entered Plaintiffs' residence with their guns drawn and without a warrant." *Id*. Shortly thereafter, Jolliff entered. *Id*. Officers stopped near the edge of the kitchen to announce their office and purpose. *Id.* at 7.

At the time officers entered the residence, Plaintiffs were asleep on the second floor. *Id.* Around 1:49 a.m., Plaintiffs first encountered Defendants as they descended the staircase to the back, left side of the kitchen. *Id*. "Ebert told Plaintiffs that he believed a suspect with a gun had

---

[2]At 1:42 a.m., Ebert had broadcasted that the suspect had run into the residence at 3555 North *12th* Street. ECF No. 17 at 5. His 1:44 a.m. message corrected that mistake. *Id*.

run into the house, and directed them to wait outside on the front porch." *Id*.

Versey was shirtless, and Washington was wearing sleeping attire. *Id*. Washington's nephew, who is not a party to this suit, was also directed outside while wearing nothing but a towel around his waist. *Id*. Roembke "either pointed his gun at Ms. Washington's nephew or pointed the gun in Ms. Washington's nephew's direction in 'low ready' position." *Id*. Roembke grabbed Washington's nephew's arm and took him out of the residence. *Id*.

### 3.3 The Search

Defendants searched the residence. *Id*. They began on the first floor and continued into the bedrooms on the second floor. *Id*. While in the kitchen, Jolliff "noted an interior surveillance camera and alerted others . . . . Roembke turned the camera to face the wall." *Id*. "Roembke had never been specifically trained to obstruct interior surveillance cameras, but believed doing so was necessary for officer safety under the circumstances." *Id*. Once the camera was turned around, it no longer captured the search of the home.[3] *Id.* at 8.

During the search, Roembke opened and searched a kitchen cabinet. *Id*. Once on the second floor, Roembke and others searched the bedroom, including the closet, as well as an adjacent room. *Id*. Roembke "lifted the mattress in the bedroom because he believed someone could be hiding underneath. Prior to him doing so, another officer can be heard [on body-camera video] opining that there's not going to be anything underneath the

---

[3]The camera was triggered by motion or sound. ECF No. 17 at 8. In the course of discovery, Versey downloaded and produced all of the recordings related to the incident. *Id*. None of the relevant videos show a fleeing suspect—or the officers for that matter—entering Plaintiffs' residence. *Id*. None of the parties viewed these recordings until after the fact. *Id*.

bed." *Id*. Before he lifted the mattress, Roembke did not see anything indicating that someone might be underneath the bed. *Id*. at 9.

Roembke returned to the first floor, but at 1:56 a.m., he went back upstairs to search under the bed and in the back of the closet again. *Id*. "During the second search of the bed, Officer Roembke picked up the mattress and the box spring." *Id*. He testified that he "believed the box spring could conceal a person if modified." *Id*.

While the rest of the officers searched the residence, Jolliff remained in the first-floor kitchen area. *Id*. "He was present when Officer Roembke opened the kitchen cabinet, and when another officer opened the refrigerator and freezer door." *Id*. Jolliff did not intervene in either case. *Id.* at 10.

At 2:04 a.m., Franco ordered all officers—except Ebert and Sosa—to clear the scene. *Id*. By 2:09 a.m., the last unit had left. *Id*. Though officers never saw or heard the fleeing suspect exit the Plaintiffs' home, the suspect was never located. *Id*. "A handgun matching the description of the fleeing subject's gun was later recovered from the backyard of 3551 N. 11th Street, in an area between the abandoned house and the Plaintiffs' residence." *Id*.

### 4. ANALYSIS

Plaintiffs, in their complaint, raise two main claims: (1) unreasonable search and seizure (against Ebert, Roembke, Franco, and Jolliff) and (2) failure to intervene (against Roembke, Franco, and Jolliff). *See generally* ECF No. 1-3. As to each claim, they seek punitive damages against all Defendants. *Id*. at 8–9. The City of Milwaukee, they contend, is liable as to both claims pursuant to Wisconsin Statute § 895.46 for "payment of any judgment entered against an individual employee Defendants in this action

because said Defendants were acting within the scope of their employment when they committed the acts described above." *Id*. at 8–9.

In their motion for summary judgment, Defendants contend that all claims should be dismissed. ECF No. 16. With respect to the unreasonable search and seizure claim, they argue that probable cause and exigent circumstances existed or that qualified immunity applies. *Id.* at 1. With respect to the failure to intervene claim, they argue it must fail because there was no underlying constitutional violation, because Defendants lacked knowledge "that others were committing or were about to commit a constitutional violation," or because of the absence of a realistic opportunity to intervene. *Id*. Finally, with respect to punitive damages, they argue that the absence of malicious intent, ill will or spite, combined with the lack of evidence upon which a factfinder could find reckless disregard for Plaintiffs' rights, precludes a finding of punitive damages. *Id.* at 1–2. The Court addresses each argument in turn.

### 4.1 Unreasonable Search and Seizure

#### 4.1.1 The Warrantless Entry

The Court begins by describing the state of the law. The Fourth Amendment protects against unreasonable searches and seizures of persons and property. U.S. CONST. Amend. IV. It generally prohibits searches and seizures without a warrant founded on probable cause or voluntary consent. *See Steagald v. United States*, 451 U.S. 204, 211 (1981); *Payton v. New York*, 445 U.S. 573, 586–87 (1980); *Kentucky v. King*, 563 U.S. 452, 459 (2011). As a result, an officer's warrantless entry into a home is presumptively unreasonable. *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006); *Groh v. Ramirez*, 540 U.S. 551, 559 (2004); *United States v. Rivera*, 248 F.3d 677,

680 (7th Cir. 2001) (citing *Payton v. New York*, 445 U.S. 573, 585–86 (1980) and *United States v. Saadeh*, 61 F.3d 510, 516 (7th Cir. 1995)).

In certain instances, however, the exigencies of a situation may—consistent with the Fourth Amendment's reasonableness requirement—justify entry into a home in the absence of a warrant. *Mincey v. Arizona*, 437 U.S. 385, 394 (1978). But in order for an exigent circumstances exception to apply, there must also exist probable cause to believe a crime has occurred. *United States v. Venters*, 539 F.3d 801, 807 (7th Cir. 2008) (citations omitted).[4]

---

[4]Whether both probable cause *and* exigent circumstances are required or whether exigent circumstances are enough on their own to permit a warrantless search was not clear at the time the events of this case took place. Although the parties have not briefed this issue, the Court nonetheless addresses it for the sake of thoroughness.

The Supreme Court seems to have answered this question, at least in the emergency aid context, quite recently in *Case v. Montana*, No. 24-624, 2026 WL 96690, at *6 (U.S. Jan. 14, 2026) ("We repeat today what we have held before: An officer may enter a home without a warrant if he has 'an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury.'" (citing *Brigham City*, 547 U.S., at 400)). However, it is not clear how this finding translates to the broader exigent circumstances context. Moreover, this case was not decided at the time of the alleged instances here.

Consequently, the Court looks to the majority of case law from the Supreme Court and Seventh Circuit that existed at the time of this incident. Some cases do operate disjunctively, seemingly requiring either probable cause *or* exigent circumstances. For instance, in *Sutterfield v. City of Milwaukee*, the Seventh Circuit indicated explicitly that exigent circumstances based on an emergency, without probable cause, would be enough. 751 F.3d 542, 564 (7th Cir. 2014).

But the overwhelming majority of cases speak conjunctively, requiring both probable cause *and* exigent circumstances. *See, e.g.*, *Kirk v. Louisiana*, 536 U.S. 635, 638 (2002); *United States v. Marshall*, 157 F.3d 477, 481 (7th Cir. 1998) (citing *Welsh v. Wisconsin*, 466 U.S. 740, 749 (1984)); *United States v. Rivera*, 248 F.3d 677, 680 (7th Cir. 2001) (citing *Marshall*, 157 F.3d at 481–82; *Reardon v. Wroan*, 811 F.2d 1025, 1028 (7th Cir. 1987) (citing *Payton*, 445 U.S. at 587–88 and *United States v. Paul*, 808 F.2d 645, 647 (7th Cir. 1986)); *United States v. Andrews*, 442 F.3d 996, 1000 (7th

"Probable cause" for a search exists where, based on a totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *see also United States v. Scott*, 516 F.3d 587, 589 (7th Cir. 2008) (citing *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). "It requires a probability, not absolute certainty, that contraband or evidence of a crime will be found." *United States v. Zahursky*, 580 F.3d 515, 521 (7th Cir. 2009) (collecting cases). The level of assuredness that an officer needs to have has been described many different ways. In some cases, it is described as a "fair probability," *id.* at 522, or a "substantial chance," *United States v. Sidwell*, 440 F.3d 865, 869 (7th Cir. 2006), that evidence of a crime will be found. In other cases, probable cause has been described merely as "a good reason to act." *Hanson v. Dane County, Wisconsin*, 608 F.3d 335, 338 (7th Cir. 2010) (citing *Gates*, 462 U.S. at 235). Probable cause does not, by contrast, require that it be "more likely than not" that a crime has been committed. *Id.*; *see also United States v. Funches*, 327 F.3d 582, 586 (7th Cir. 2003). "In determining whether there is probable cause to search, law enforcement officers may draw reasonable inferences from the facts based on their training and

---

Cir. 2006) (quoting *Rivera*, 248 F.3d at 680–81); *Anderson v. Creighton*, 483 U.S. 635, 641 (1987); *Mason v. Godinez*, 47 F.3d 852, 855 (7th Cir. 1995) (citing *Payton*, 445 U.S. at 586). Indeed, this is true even of several cases that took place after *Sutterfield*, and of cases that hinged on the existence of an emergency. *See, e.g.*, *United States v. Leo*, 792 F.3d 742, 749 n.2 (7th Cir. 2015); *United States v. Karmo*, 109 F.4th 991, 995 (7th Cir. 2024); *Marvin v. Holcomb*, 72 F.4th 828, 832 (7th Cir. 2023).

As a result, to avoid any possible foot faults, the Court will read the law in the light most favorable to the non-moving party (here, the Plaintiffs) and will operate under the premise that both probable cause and exigent circumstances are required for the exigent circumstances exception to apply.

experience." *Zahursky*, 580 F.3d at 521 (citing *United States v. Reed*, 443 F.3d 600, 603 (7th Cir. 2006)).

Exigent circumstances, as relevant here, exist where "there is a reasonable belief by police that their safety, or the safety of the public, may be threatened." *United States v. Webb*, 83 F.3d 913, 916 (7th Cir. 1996) (citations omitted). One subcategory of exigent circumstances is the emergency aid exception, according to which officers may enter a home without a warrant if they have an "objectively reasonable basis for believing," *Brigham City*, 547 U.S. at 406, that "a person within [the house] is in need of immediate aid." *Mincey v. Arizona*, 437 U.S. 385, 392 (1978). Phrased differently, this exception allows "officers [to] enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City*, 547 U.S. at 403.

Another exigent circumstance is implicated when police are in "hot pursuit" of a fleeing suspect. *Lange v. California*, 594 U.S. 295, 296 (2021) (citing *United States v. Santana*, 427 U.S. 38, 42–43 (1976)). The caselaw surrounding this exception differentiates between pursuit of felons and misdemeanants. In the former case, the rule is almost, if not entirely, categorical, permitting warrantless entry where a suspected felon flees into a home. *Id.* at 315 (Kavanaugh, J., concurring) ("Importantly, moreover, the Court's opinion does not disturb the long-settled rule that pursuit of a fleeing felon is itself an exigent circumstance justifying warrantless entry into a home . . . . In other words, the police may make a warrantless entry into the home of a fleeing felon regardless of whether other exigent circumstances are present." (internal citations omitted)). In the latter circumstance, the law requires a case-by-case, totality-of-the-circumstances

analysis, but flight of a misdemeanant alone is not enough to justify warrantless entry into a home. *Id.* at 296. In any event, the burden is on the government to prove that exigent circumstances exist. *Marshall*, 157 F.3d at 482 (citing *United States v. Robles*, 37 F.3d 1260, 1263 (7th Cir. 1994)).

#### 4.1.1.1 Probable Cause

The Court begins its analysis with probable cause.[5] Defendants argue that probable cause existed to justify the warrantless entry into Plaintiffs' residence. ECF No. 20 at 6–12. Probable cause existed, Defendants argue, because the fleeing suspect appeared to be resisting or obstructing an officer and because Ebert had reason to suspect the gun was not lawfully possessed. *Id.* at 8–9. In any event, Defendants argue that qualified immunity should apply, because the facts and circumstances available to Ebert demonstrate a good faith basis for believing that probable cause existed, and his conduct was not flagrantly unconstitutional. *Id.* at 19–20.[6]

Plaintiffs, in response, argue that a reasonable jury could find no probable cause—that Ebert did not have a reasonable belief that the fleeing suspect entered Plaintiffs' home. ECF No. 23 at 1. They question whether Ebert had a reasonable belief that the fleeing individual entered Plaintiffs' home where (1) Ebert did not see the individual enter, and he lost sight of the individual before seeing the last few inches of the outer door close, and

---

[5]In a damages suit, the matter of probable cause "typically falls within the province of the jury, though a conclusion that probable cause existed as a matter of law is appropriate when there is no room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1246 (7th Cir. 1994).

[6]Defendants further argue that the other officers were entitled to rely on Ebert's report, especially in such a fast-moving situation. *Id.* at 9. At the very least, Defendants assert, prior cases do not establish that Roembke, Franco, or Jolliff should have done more to investigate Ebert's basis of knowledge. *Id.* at 20.

(2) the main, inner door did not open or close, Ebert found the door closed and locked, and there were no indications of entry from inside the home. *Id.* at 6. Moreover, where the gravity of the offense is minimal, Plaintiffs argue Defendants must have a greater quantum of information pointing to *this specific residence* to justify warrantless entry. *Id.* at 10–11.

Here, the Court finds that Defendants have amply shown probable cause of a crime having been committed, and no reasonable jury could conclude otherwise. The parties do not dispute that the suspect fled from Ebert upon his arrival. ECF No. 17 at 2. Wisconsin Statute § 946.41 dictates that resisting or obstructing an officer constitutes a misdemeanor. Both Wisconsin and federal courts addressing the matter have held that fleeing or hiding from an officer constitutes "obstructing." *State v. Watters*, 2010 WI App 100, ¶ 6 (Wis. Ct. App. 2010) (citing *State v. Grobstick*, 546 N.W.2d 187, 189–90 (Wis. Ct. App. 1996)); *State v. Graham*, 583 N.W.2d 674 (Wis. Ct. App. 1998) (citing *Grobstick*, 546 N.W.2d at 189-90); *United States v. McAlister*, No. 06-CR-142, 2007 WL 101215, at *4 (E.D. Wis. Jan. 10, 2007) (citing *Grobstick*, 546 N.W.2d at 190). Indeed, "Plaintiffs do not dispute that Officer Ebert may have had . . . probable cause to arrest for a minor misdemeanor offense." ECF No. 23 at 7 n.3.

However, probable cause to enter a particular home requires more than just some probability that a crime has occurred *somewhere*. It requires an assessment—using a "practical, commonsense" framework based on the totality of the circumstances—that there is "a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. As applied here, this means the police must have had probable cause to believe the fleeing suspect had entered Plaintiffs' house. Plaintiffs point to several disputed facts and inferences that they say render

this case inapt for summary judgment resolution and appropriate only for a jury:

> (1) the duration which the fleeing individual was out of Officer Ebert's sight prior to seeing the exterior door opening on the Plaintiffs' well-lit entryway; (2) Officer Ebert not seeing him enter the Plaintiffs' home; (3) the exterior, but not interior door opening and closing; (4) the interior door being closed and locked at the time Officer Ebert arrived at the entry; and (5) the absence of indicators from within the Plaintiffs' home that the fleeing individual was inside the house.

ECF No. 23 at 9–10 (internal citations omitted). But let us take the facts in the light most favorable to Plaintiffs. Let us assume, for instance, that Ebert lost sight of the fleeing suspect for a minute, instead of a few seconds. ECF No. 17 at 4. Even so, the Court is convinced that, as a matter of law, probable cause existed here, and no reasonable jury could find otherwise.

What did Ebert undisputedly know at the time of his arrival at the front door of Plaintiffs' home? He knew that the suspect had, after running between two homes, turned toward Plaintiffs' home. He knew, moreover, that the metal outer door had been opened recently, as he heard it open and saw it still closing itself. The question is whether this can be enough to create probable cause to believe the suspect was in the house.

The Court finds that it does. In *Dupree v. Village of Bellwood*, the court encountered a similar situation where the parties had a dispute over how far behind police were when they heard a door slam while in pursuit of their suspect and whether that dispute was material. No. 18-CV-08304, 2022 WL 2715008 (N.D. Ill. July 13, 2022). The court noted that a slamming door can indicate the presence of a fleeing suspect, but its probative value is a function of how closely the officers were pursuing. *Id.* at *7 (discussing probable cause standard (citing *Maxwell v. City of Indianapolis*, 998 F.2d 431,

434 (7th Cir. 1993))). The court further suggested that if police trailed the suspect by 2–10 seconds, then the slamming door has considerable probative value, especially relative to a situation where the officers are a minute or so behind. *Id.* As in *Dupree*, the dispute here "boils down" to a matter of seconds, as evidenced by the fact that the officers here saw the door swing closed. *Id.* at 8. Accordingly, Ebert's observations (when considered in conjunction with the 911 call that there was a disturbance just moments earlier), are enough to find that there was probable cause.

This holding is further supported by the underlying reasoning in two additional cases. First, in *United States v. Glasby*, officers were told to secure the apartment of a drug suspect. 576 F.2d 734, 736 (7th Cir. 1978). They first saw the suspect standing on the porch. *Id*.

> They announced that they were federal officers and started up the stairway. On their way up the stairs, they heard a door slam and when they reached the porch found the door closed. The agents again identified themselves, waited ten seconds, and then Zervos kicked in the door.

*Id*. The Court found the warrantless entry justified. *Id.* at 737. The analogy to the present case is, in this Court's view, clear enough. Ebert saw the individual in the vicinity of the house, lost sight of him, heard the door slam, and thereafter presumed he was in the house. Of course, the officers had greater knowledge there—namely, that the house belonged to the individual on the porch. But the general contours of the situation are, *in the ways that matter for the Court's purposes*, the same. Even where police do not physically see an individual use a door, they may reasonably believe an individual used that door where the individual disappears and police hear the relevant door being used.

Second, in *Nail v. Gutierrez*, after being struck by her husband, a wife called 911 but hung up without saying anything. 339 F. App'x 630, 631 (7th Cir. 2009). Officers were dispatched to the home. *Id.* When they arrived, they initially spoke with the husband, who subsequently disappeared into the house. *Id.* Officers then heard the back door slam and, without a warrant, entered the backyard, where they found the husband. *Id.* The facts after this point are largely irrelevant. The Seventh Circuit found the entry to the backyard justified when the husband "disappeared, and the officers heard the back door slam." *Id.* at 632. Officers were entitled to believe that the individual was fleeing based on that fact set. *Id.* at 633. The analogy, again, is clear. Even where police do not physically see an individual use a door, they may reasonably believe an individual used that door where the individual disappears and police hear the relevant door being used.

Here, Ebert more than *heard* the door being used. He *saw* it swing closed. The Court finds that, as a matter of law, this is sufficient to establish probable cause to believe that the individual was in the house. Probable cause, as described above, requires a "fair probability," *Zahursky*, 580 F.3d at 522, or a "substantial chance," *Sidwell*, 440 F.3d at 869. Officers had easily reached that threshold to believe that the suspect was located in the house. As a matter of law, the officers here had probable cause.

Plaintiffs' appeal to *Llaguno v. Mingey* is unavailing. ECF No. 23 at 10–11) (citing 763 F.2d 1560 (7th Cir. 1985), *abrogated by County of Riverside v. McLaughlin*, 500 U.S. 44 (1991)). In that case, police located the address of the suspect—who had escaped—and went to the house, entering it without a warrant. 763 F.2d at 1563. The Seventh Circuit found that a jury *could* find that police had probable cause to believe that the suspect was in the actual house they searched, despite not seeing him actually approach or enter the

house. *Id.* at 1565–67. The Court found a "sufficient chain linking the house to the [suspect]." *Id.* at 1567. Of course, that case held that the amount of information needed to give rise to probable cause depends on the severity of the underlying offense and its danger of imminent repetition. *Id.* at 1563. But the core point remains: even where police do not see someone enter a house, certain circumstantial information can generate probable cause to believe that the individual is in the house. Even if we assume that police here needed greater reason to believe our fleeing suspect was in the house—given the minor nature of the offense—the undisputed facts show that they had it. Ebert saw the suspect turn directly in the direction of the house, heard the outer door open, and saw the outer door close the final few inches. So, if anything, *Llaguno* supports the proposition opposite to what Plaintiffs suggest.

*Williams v. Maurer* is similarly inapt. 9 F.4th 416 (6th Cir. 2021). For one, it is a Sixth Circuit case and therefore not binding on this Court. More significantly though, that case is insufficiently analogous to be useful to the Court. The case involved an anonymous 911 report of a burglary. *Id.* at 423. When police arrived, they found a broken outer windowpane but intact inner pane. *Id*. The resident opened the door a crack, but she did not give police access to the apartment. *Id.* at 424. Still, in that interaction, police saw no signs of suspicious activity. *Id*. In that case, the Sixth Circuit grappled with what quantum of information police must have above and beyond an anonymous 911 call (if any) to generate a reasonable belief that exigent circumstances existed. *Id.* at 433.

This case involved nothing similar. Police were not drawn to this house based on a 911 call, but on observing the fleeing suspect turn towards it and observing evidence that suggested *someone* had used or tried to use

the door to the home. An unbroken pane of glass, as a matter of physics, means that someone could not have gone through it. A closed door does not carry the same implication; someone could have used it and closed it, and doors do not always make sound. In *Williams*, a resident had opened the door and said that all was fine; here, no response came from the residents, which belies the notion that police should have believed all was well with them. In sum, the situations are so insufficiently analogous that the Court cannot see how the reasoning of *Williams* should apply here (to the extent it should apply at all).

#### 4.1.1.2 Exigent Circumstances

With probable cause established, the Court turns to the next step in its analysis—whether some form of exigent circumstances exception applies here. *United States v. Huddleston*, 593 F.3d 596, 600 (7th Cir. 2010) ("The question of whether exigent circumstances existed is a mixed question of fact and law . . . ." (citing *United States v. Andrews*, 442 F.3d 996, 1000 (7th Cir. 2006))).

Defendants argue that two exigent circumstances can be found: the "hot pursuit" of a fleeing suspect exigent circumstance and the exception based on the need to protect individuals inside the house. ECF No. 20 at 11. Moreover, in any event, they contend that qualified immunity should apply. *Id.* at 2. Plaintiffs, in response, argue that no exception to the warrant requirement existed. ECF No. 23 at 1. In general, they contend that there was no evidence the fleeing individual threatened or harmed anyone, and the mere presence of a weapon does not create an exigency. *Id.* at 8 (collecting cases). More specifically, Plaintiffs argue that "hot pursuit" does not justify the warrantless entry, as the fleeing individual was primarily suspected of a misdemeanor and had not indicated that he was a threat,

which is generally not enough to implicate the "hot pursuit" exception. *Id.* at 15–16. Furthermore, Plaintiffs argue the emergency aid doctrine does not apply, because that exception is intended for circumstances where no crime is suspected of occurring, and here, there was suspicion that someone had committed a crime. *Id.* at 9.

The Court begins with the "hot pursuit" exception. As noted above, it is not entirely clear whether a categorical rule exists permitting warrantless entry into a home when police are in hot pursuit of a fleeing *felon*, though something like that seems to be the case. *Lange v. California*, 594 U.S. 295, 296 (2021) ("Even assuming that Santana treated fleeing-felon cases categorically . . ."); *id.* at 315 (Kavanaugh, J., concurring) ("Importantly, moreover, the Court's opinion does not disturb the long-settled rule that pursuit of a fleeing felon is itself an exigent circumstance justifying warrantless entry into a home . . . . In other words, the police may make a warrantless entry into the home of a fleeing felon regardless of whether other exigent circumstances are present." (internal citations omitted)). But what is clear is that in the case of fleeing misdemeanants, assessment of whether warrantless entry is permitted should be done via a case-by-case, totality-of-the-circumstances analysis; flight alone does not justify warrantless entry. *Id.* at 296. Police must additionally consider factors like preventing "imminent harm to others, a threat to the officer himself, destruction of evidence, or escape from the home." *Id.* at 308.

Here, while the Court is sympathetic to Plaintiffs' plight, the Court is constrained to find that warrantless entry involved no constitutional violation. *White v. Hefel* counsels in favor of this conclusion. 875 F.3d 350 (7th Cir. 2017). In that case, the Seventh Circuit concluded that the "hot pursuit" exception justified warrantless entry into a home where police

were pursuing one suspected of mere trespass. *Id.* at 357. The Seventh Circuit reasoned:

> The officers were in hot pursuit of a fleeing suspect. They were hardly going to shout into the house and ask [the suspect] to mark time while they checked in with a state judge. Moreover, they had good reason to conduct a protective search of the house. They had no idea, as they ran in, whether [the suspect] had a weapon, if he did whether he had dropped it on his way to the back room where he was found, whether anyone else in the house was in danger, or whether [the suspect] would resist arrest.

*Id*. The analogy to the instant case is clear. Police had no way of knowing whether the fleeing suspect lived in this house or merely ran into the nearest open home. They had no way of knowing whether anyone in the house was in danger, and "police need not wait for screams from within in order to fear for the safety of occupants or themselves." *United States v. Lenoir*, 318 F.3d 725, 730 (7th Cir. 2003) (citing *United States v. Brown*, 64 F.3d 1083, 1086 (7th Cir. 1995)). Here, police *knew* the fleeing suspect had a weapon, raising the risk profile of the situation. Succinctly noted, this level and nature of knowledge is, as a matter law, sufficient to generate reasonable belief in an exigent circumstance.[7] *White* also answers Plaintiffs' suggestion that police

---

[7]Plaintiffs argue *White* is distinguishable, because in that case, (1) officers *knew* the home did not belong to the fleeing suspect, (2) the homeowners gave consent, and (3) the officers actually saw the fleeing suspect enter the home.

For one, probable cause does not require absolute knowledge; it does not even require that it be "more likely than not" that a state of the world is the case. *Hanson*, 608 F.3d at 338. Instead, it requires a "fair probability," *Zahursky*, 580 F.3d at 522, or a "substantial chance," *Sidwell*, 440 F.3d at 869. So the distinction between "knowing" and "having strong reason to believe" is immaterial in the probable cause analysis. Moreover, the Court addresses this point in greater detail below, as there is a case directly on this point stating that merely *not knowing* whether a home belongs to someone is enough to create reasonable fear for occupants.

must know of a weapon being used to find an exigent circumstance; in this circuit, it has been held that in certain circumstances, police do not even need to know the individual has a weapon to find exigency.

*United States v. Lenoir*, 318 F.3d 725, reinforces this conclusion and draws the Court's attention to the additional basis for the warrantless entry here—namely, the need to prevent imminent injury to occupants of the home or officers. In that case, police were dispatched regarding a disturbance in a high-crime neighborhood. *Id*. at 727. When they arrived, they observed a man walking down an alley, seemingly intoxicated and carrying two firearms. *Id*. When he noticed the police, the man fled into a nearby home. *Id*. Police had no way of knowing whether he lived in the home, a fact that would prove important to the Court's later analysis. *Id*. Police chased him into the curtilage. *Id*. Police framed the inquiry primarily in terms of "address[ing] the risk of danger to [police] or any occupants of the home" by the armed suspect, and that reasoning would seem to apply here. *Id.* at 730.

> [P]olice were not aware that [the suspect] was entering his own home. They saw [the suspect] take flight upon seeing them approach and have difficulty entering the home while armed with a shotgun and an assault rifle. We find that the police reasonably feared for the safety of occupants in the home and for their own safety, especially given [the suspect]'s intoxicated state. By delaying entry into the home, in order to find out if [the suspect] lived there, police would have risked

Second, whether homeowners gave consent was, in fact, disputed in *White*, and the court did not hinge the analysis on that point; indeed, it did not come up in the Seventh Circuit's analysis of the warrantless entry at all. 875 F.3d at 357.

Finally, the fact that officers actually saw the fleeing suspect enter the home is immaterial for the reasons just discussed above. Probable cause does not care if police actually know something to be true, so long as they clear the substantial chance or fair probability threshold.

giving Lenoir the opportunity to harm police or whomever was inside. In fact, [one officer] testified that he saw a woman and children in the home when he entered. We will not force police to risk the safety of others or themselves when the circumstances and a suspect's behavior create a reasonable belief that they or someone inside may be in danger.

*Id.* at 730–31 (internal citations omitted). The same logic applies here, providing the additional circumstances beyond the misdemeanant's flight to justify warrantless entry. Again, officers here had no way of knowing whether the fleeing suspect lived in this house. They knew he was armed and ran from them into this house. This has been deemed enough to create fear for the safety of occupants and officers. The Court will similarly find that exigent circumstances unequivocally existed here.

Overall, the *material* facts here are undisputed, and the Court finds that, as a matter of law, exigent circumstances existed. Combined with the Court's earlier finding of probable cause, this conclusion means there was no constitutional violation in the warrantless entry. Thus, the Court need not reach the question of whether a right was "clearly established," as would be required under a qualified immunity analysis. *Humphries v. Milwaukee County*, 702 F.3d 1003, 1006 (7th Cir. 2012).

### 4.1.2 The Search

Plaintiffs also sue on the basis of the search itself. *See* ECF No. 1-3 at 8. Defendants, in their motion for summary judgment, argue that the officers' search was "strictly tied to and justified by" the circumstances which rendered its initiation lawful. ECF No. 20 at 14 (citing *Anderson v. City of West Bend Police Dep't*, 774 F. Supp. 2d 925, 945 (E.D. Wis. 2011)). They frame the search as a lawful protective sweep and argue that each individual component that Plaintiffs object to can be justified as well within

the scope of such a sweep. *Id.* at 14–16. And again, Defendants raise qualified immunity as a defense. *Id.* at 18.

Plaintiffs, in response, assert that the search of the home was unlawful. ECF No. 23 at 17. They argue that it is for a jury to determine: (1) whether Roembke obstructing the home surveillance camera was evidence of an unlawful motive; (2) whether six officers searching Plaintiffs' home for 16 to 21 minutes was a cursory search; and (3) whether the Plaintiffs' kitchen cabinet, mattress, or box spring could have reasonably harbored the fleeing individual. *Id.* But, in essence, they argue that the jury will conclude the purported "protective sweep" was, in fact, unlawful, in large part because it went beyond a cursory inspection both in length and in scope. *Id.* at 18–19.

As a general matter, the Fourth Amendment permits a protective sweep

> if the searching officer possessed a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted the officer in believing that the area swept harbored an individual posing a danger to the officer or others.

*Maryland v. Buie*, 494 U.S. 325, 327 (1990). As described in *United States v. Starnes*:

> The sweep must also be justified by more than a mere inchoate and unparticularized suspicion or hunch. The search must be cursory, lasting no longer than is necessary to dispel the reasonable suspicion of danger. It must also be limited to a cursory visual inspection of places where a person might be hiding.

741 F.3d 804, 808 (7th Cir. 2013) (internal citations and quotation marks omitted). Such an inquiry is "exceptionally fact-intensive" and requires

analysis of many factors including, among others, "the configuration of the dwelling, the general surroundings, and the opportunities for ambush." *Id.* (citing *United States v. Burrows*, 48 F.3d 1011, 1016 (7th Cir. 1995)).

### 4.1.2.1 Turning of the Camera

The Court finds Plaintiffs' organization of the issues helpful and will begin with point (1)—that is, if it is for a jury to decide whether Roembke obstructing the home surveillance camera was evidence of an unlawful motive. The Court is satisfied that it can dispose of this point fairly quickly, as the caselaw on this point is clear. "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren v. United States*, 517 U.S. 806, 806 (1996). Indeed, "the Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, whatever the subjective intent." *Id.* at 814 (citing *United States v. Robinson*, 414 U.S. 218, 236 (1973)). So even if Roembke *did* turn the camera with an unlawful motive in mind, that is not part of the analysis. The Court merely addresses the officers' *actions* and whether they were reasonable and therefore lawful under the circumstances.

### 4.1.2.2 Duration of the Search

Moving to Plaintiffs' second point, Plaintiffs contend that it is for a jury to decide "[w]hether six officers searching Plaintiffs' home for 16 to 21 minutes was a cursory search." ECF No. 23 at 17. Within this circuit, most cases addressing the duration of protective sweeps have operated in the range of zero to five minutes, and all cases that the Court has located have approved of such durations.[8] But in all of these cases, rather than focusing

---

[8]*See, e.g., Burrows*, 48 F.3d at 1017 (permitting a 5-minute sweep where police searched four bedrooms and a closet); *Henderson*, 748 F.3d at 793 (permitting a protective sweep lasting no longer than 5 minutes); *Contreras*, 820 F.3d at 260

on length alone, the inquiry was highly fact-specific and context-dependent. For instance, the Seventh Circuit considered the number of rooms and spaces searched, *Burrows*, 48 F.3d at 1017, whether anything was touched or moved, *United States v. Henderson*, 748 F.3d 788, 793 (7th Cir. 2014), and whether officers "search[ed] any drawers, containers, or other places for evidence," *United States v. Contreras*, 820 F.3d 255, 269 (7th Cir. 2016). And more generally, as noted, courts are to consider "the configuration of the dwelling, the general surroundings, and the opportunities for ambush." *Starnes*, 741 F.3d at 808 (citing *Burrows*, 48 F.3d at 1016).

With that general framework in mind, the Court is skeptical that the protective sweep here was permissible. It lasted 20 minutes, far beyond the five minutes the Seventh Circuit has deemed worthy of weighing in on. It involved a search of the kitchen, two upstairs rooms, and a closet—notwithstanding the second search of the upstairs bedroom, which itself seems incompatible with a "sweep." The Court views this as expanding beyond the scope of a permissible protective sweep.

Even so, the Court is constrained to find that qualified immunity applies. "The doctrine of qualified immunity protects government officials from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Humphries*, 702 F.3d at 1006 (quoting *Pearson v. Callahan*, 555 U.S. 800, 818 (2009)) (internal quotation marks omitted). To be clearly established at the time of the challenged conduct, the right's

---

(permitting a sweep lasting less than a minute); *United States v. Schmitt*, 770 F.3d 524, 532 (7th Cir. 2014) (permitting a sweep lasting five minutes).

contours must be "sufficiently clear that every reasonable official would have understood that what he is doing violates that right," and "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)) (internal quotation marks omitted). This standard "protects the balance between vindication of constitutional rights and government officials' effective performance of their duties by ensuring that officials can reasonably . . . anticipate when their conduct may give rise to liability for damages." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks and citation omitted).

In assessing qualified immunity, the Court undertakes a two-part inquiry. *Eversole v. Steele*, 59 F.3d 710, 717 (7th Cir. 1995). First, the plaintiff must establish that the defendant violated a constitutional right. *Id*. If the plaintiff fails to do so, the Court's inquiry ends. Instead, if a constitutional right was violated, the Court asks if the constitutional right was clearly established at the time in question. *Id*. "To be clearly established, a constitutional right must be confirmed by Supreme Court or [Seventh] Circuit precedent or the overwhelming weight of authority from other courts." *Finch v. Rapp*, 38 F.4th 1234, 1240 (10th Cir. 2022) (citing *Cortez v. McCauley*, 478 F.3d 1108, 1114–15 (10th Cir. 2007)); *see also Jacobs v. City of Chicago*, 215 F.3d 758, 767 (7th Cir. 2000) "[W]e look first to controlling Supreme Court precedent and our own circuit decisions on the issue."). The cases must be closely analogous. *Reed v. Palmer*, 906 F.3d 540, 547 (7th Cir. 2018) (citing *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013)). It should also be noted that "in some rare instances where the constitutional violation is obvious, a plaintiff need not show any analogous cases, 'as widespread compliance with a clearly apparent law may have prevented the issue from

previously being litigated.'" *Baird v. Renbarger*, 576 F.3d 340, 345 (7th Cir. 2009) (quoting *Denius v. Dunlap*, 209 F.3d 944, 951 (7th Cir. 2000)).

Here, even if Plaintiffs can show a constitutional violation, the Court finds that it was not clearly established at the time of the August 2021 incident. The Court has located no Supreme Court or Seventh Circuit case standing for the proposition that a search in the 16-to-21-minute range is unconstitutional, much less one finding unconstitutionality under a similar set of facts. Plaintiffs cite to two cases in support of their proposition that this search is patently illegal (and presumably clearly established as illegal). First, they cite to an unreported district court case from the Northern District of Illinois which denied summary judgment in the case of a 20-minute search, holding that qualified immunity did not apply to bar the suit. ECF No. 23 at 19 (citing *Xie v. City of Chicago*, No. 14-CV-6082, 2016 WL 6193981 (N.D. Ill. Oct. 24, 2016)). This case, of course, does not bind the Court, nor is it weighed heavily in the qualified immunity analysis.

Second, Plaintiffs cite to *United States v. Hernandez-Mieses*, a case from outside the Seventh Circuit which assessed case law from across the circuits. ECF No. 23 at 19 (citing 931 F.3d 134, 142–45 (1st Cir. 2019)). But even the assessment in that case does not provide Plaintiffs with the assurances they seek. None of the cases cited there address a 16-to-21-minute search. *Hernandez-Mieses*, 931 F.3d at 142–45. They all permit shorter searches, but none provides that a search of this length would be illegal. *Id*. Indeed, the closest case cited *granted* qualified immunity in the case of a 5-to-15-minute search. *Id*. at 142 (citing *Gomez v. Feissner*, 474 Fed. App'x 53, 56 (3d Cir. 2012)). The First Circuit there ultimately concluded that the 22-minute search may have been unreasonably prolonged, *id*. at 144, but again, in the absence of "overwhelming" circuit alignment, *Finch*, 38 F.4th at 1240

(citing *Cortez*, 478 F.3d at 1114–15), this is not sufficient to make qualified immunity inapplicable.[9]

In short, there is not sufficient caselaw on point demonstrating that a search of this length was illegal. Officers were not "on notice" of the illegality of their actions, *Hope v. Pelzer*, 536 U.S. 730, 739 (2002), nor was this the "rare instance" where the constitutional violation is so obvious that Plaintiff "need not show any analogous cases, 'as widespread compliance with a clearly apparent law may have prevented the issue from previously being litigated.'" *Baird*, 576 F.3d at 345 (quoting *Denius*, 209 F.3d at 951). The proper length of a protective sweep, governed by the standard of a "reasonable belief based on specific and articulable facts," *Buie*, 494 U.S. at 327, is not so easily identified as to make this an obvious case. Qualified immunity must therefore apply.

### 4.1.2.3 Manner of the Search—Cabinet, Mattress, and Box Spring

The Court turns to the final point of contention in the search— namely, whether the Plaintiffs' kitchen cabinet, mattress, or box spring

---

[9]For thoroughness' sake, the Court inquired into what district courts have been saying about searches of this length. The results have been decidedly mixed, reinforcing the Court's conclusion that this is not a settled area of law. *See, e.g.*, *United States v. Nora*, No. CR 09-92 SVW, 2010 WL 11463635, at *19 (C.D. Cal. Feb. 3, 2010), *rev'd and remanded on other grounds*, 765 F.3d 1049 (9th Cir. 2014) (finding a 15-to-30 minute protective sweep impermissible); *United States v. Brown*, No. 22-CR-251-PP, 2024 WL 960930, at *7 (E.D. Wis. Mar. 6, 2024) (permitting a 20-minute protective sweep); *Hodo v. City of Chicago*, No. 19 C 1561, 2022 WL 865794, at *6 n.5 (N.D. Ill. Mar. 23, 2022) (finding a 20-minute protective sweep impermissible); *United States v. Goodrich*, No. 10-00229-01-CR-W-ODS, 2011 WL 4396933, at *6 (W.D. Mo. Aug. 31, 2011), *report and recommendation adopted*, No. 10-00229-01-CR-W-ODS, 2011 WL 4404118 (W.D. Mo. Sept. 21, 2011), *aff'd*, 739 F.3d 1091 (8th Cir. 2014) (permitting a 20-to-25 minute protective sweep); *United States v. Haro-Verdugo*, No. CR05125TUCDCBBPV, 2006 WL 8426782, at *4 (D. Ariz. Apr. 26, 2006) (permitting a 15-minute protective sweep).

could have reasonably harbored the fleeing individual such that officers searching there could be justified as part of a legitimate protective sweep. *Buie*, 494 U.S. at 327 (holding that protective sweep must be confined to place "in which a person might be hiding").

As to the kitchen cabinet, the Court has identified no case from the Supreme Court or Seventh Circuit affirmatively approving of or rejecting a protective sweep that included a search of a cabinet purportedly big enough to hold a person.[10] Outside of this circuit, there are some cases disapproving of a sweep that included kitchen cabinets, *see, e.g.*, *United States v. Green*, 9 F.4th 682, 692 (8th Cir. 2021), but none of those appeared to address a cabinet that was argued to be big enough to conceal a person. Simultaneously, there is some history of circuit courts approving of sweeps of large cabinets or similarly "unusual" spaces, so long as they were big

---

[10]By and large, protective sweep cases that do mention "cabinets" or similar objects mention them only in passing, to say that officers are especially justified in their protective sweeps because they did *not* open any cabinets or similar objects. *Contreras*, 820 F.3d at 269 (approving of a protective sweep and noting that "officers did not search any drawers, containers, or other places for evidence"); *Starnes*, 741 F.3d at 808 (approving of a protective sweep and noting that officers "did not need to open any cabinets or drawers"); *United States v. Davis*, 44 F.4th 685, 690 (7th Cir. 2022) (permitting a sweep and noting that "officers did not search any enclosed areas such as drawers or cabinets"); *United States v. Richards*, 937 F.2d 1287, 1292 (7th Cir. 1991) (approving of a protective sweep where the officer "did not search through drawers or dawdle in each room").

Still, this is not tantamount to saying that opening the cabinets—especially if they were arguably big enough to hold a person—would have necessarily been a violation of the Fourth Amendment, and the Court has found no case standing for that proposition. The only case the Court has located from the Seventh Circuit addressing officers *actually opening* a cabinet during a protective sweep was one in which the cabinet was within the suspect's reach and officers could have reasonably believed a weapon was in there; the court therefore approved of the sweep. *United States v. Tejada*, 524 F.3d 809, 811 (7th Cir. 2008). This is simply not on point.

enough to conceal a person, *see, e.g.*, *United States v. Jackson*, 100 F.3d 950 (4th Cir. 1996), *United States v. Smith*, 354 F. App'x 99, 102 (5th Cir. 2009), *United States v. Green*, 560 F.3d 853, 857 (8th Cir. 2009).

As a result of this, even if the Court were to find a constitutional violation, the Court could not find that the violation was clearly established. There is no controlling Supreme Court or Seventh Circuit precedent on the matter, and even if the Court were to "cast a wider net" and look to whether "all relevant case law" demonstrates "such a clear trend . . . that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time," *Abbott v. Sangamon County*, 705 F.3d 706, 731 (7th Cir. 2013), no such assurances would be found. The survey of case law provided above yields no obvious unconstitutionality. Plaintiffs' claim, to the extent it addresses the sweep of the cabinet, must therefore be dismissed on the basis of qualified immunity.

As to the mattress and box spring, the Court finds that the lifting of the mattress and box spring were unlawful steps beyond the bounds of a protective sweep. As the Seventh Circuit said in *United States v. Walker*:

> The government failed to identify anything in the record to indicate that the officers here had reason to believe the area between the mattress and box spring had been hollowed out such that lifting the mattress would be "necessary to dispel the reasonable suspicion of danger."

143 F.4th 889, 898 (7th Cir. 2025) (quoting *Buie*, 494 U.S. at 336). Here, too, the government has given no reason to suspect that *this* mattress and *this* box spring were manipulated in some way so as to allow the fleeing suspect to attack from within them. Roembke believed someone could be hiding inside the box spring "if modified," ECF No. 17 at 9, but he gave no reason to believe that this box spring actually was modified. Indeed, the Court fails

to see how officers believed someone could have hidden in the mattress or box spring when Plaintiffs were sleeping on it as officers entered their home. The explanation rings of ex post justification rather than an ex ante rationale.

That said, the Court is constrained to find that qualified immunity applies. The Seventh Circuit did not directly address the legality of disturbing a mattress or box spring in a protective search until *Walker* in July 2025, where it affirmatively stated:

> Although it may have theoretically been possible for a person to have hollowed the inside of the mattress or box spring to create a hiding place from which to attack, theoretical possibilities cannot be enough. Finding otherwise would permit officers to lift a mattress in every protective sweep, regardless of the reasonableness of their suspicions or configuration of the premises.

143 F.4th at 898. But before this point, the Seventh Circuit had given no explicit direction one way or the other. Indeed, the only indication the Seventh Circuit gave was in *United States v. Portee*, in which the court approved of a protective sweep during which a gun was found as officers "prepared to lift and look beneath a mattress and box spring." 407 F. App'x 960, 961–62 (7th Cir. 2011). So, if anything, the Seventh Circuit seemed to lean towards permissive of this type of conduct in August 2021, the time of this incident.

Moreover, the Seventh Circuit in *Walker* provided a helpful analysis of other circuits' stances on sweeps that involve lifting mattresses or box springs. Some circuits approved of them—in ways the court found distinguishable. *Walker*, 143 F.4th 889, 898–99 (citing *United States v. Bass*, 315 F.3d 561, 564 (6th Cir. 2002); *United States v. Silva*, 865 F.3d 238, 243 (5th

Cir. 2017); *United States v. Garcia-Lopez*, 809 F.3d 834, 839 (5th Cir. 2016)). Others disapproved of sweeps involving the lifting of mattresses or box springs—in ways the court found far more on point. *Id.* at 899 (citing *United States v. Blue*, 78 F.3d 56, 61 (2d Cir. 1996); *United States v. Ford*, 56 F.3d 265, 270 (D.C. Cir. 1995)). But that survey only serves to further this Court's conclusion that, as of August 2021, there was no overwhelming consensus outside of this circuit to make up for the lack of Supreme Court or Seventh Circuit guidance. In short, the Court is constrained to find that qualified immunity applies.

### 4.1.3 The Seizure

The Court now turns to the seizure of Plaintiffs. Plaintiffs argue the seizure was a violation of their Fourth Amendment rights, specifically pointing to the fact that "Defendants pointed loaded guns at Plaintiffs, detained the Plaintiffs, and deprived them of their freedom and residence, all against their will and without their consent." ECF No. 1-3 at 7. They argue that all of this was unlawful, because Defendants had no arrest warrant for Plaintiffs and no reasonable belief to detain Plaintiffs, and Plaintiffs were not suspected of having committed any crime. *Id*.

In their motion for summary judgment, Defendants contend that officers may, during legitimate police activity, temporarily detain persons not suspected of criminal activity for all parties' safety and to prevent interference. ECF No. 20 at 12 (citing *United States v. Howard*, 729 F.3d 655, 659 (7th Cir. 2013)). They further claim that this is true during searches so long as officers have "specific, articulable facts warranting them in believing a dangerous suspect could be hiding inside." *Id*. They essentially argue that if officers were justified in their initial entry, they were justified in their seizure of Plaintiffs. *Id.* at 12–13. Defendants anticipate and respond

to two arguments from Plaintiffs. *Id*. at 13. They anticipate Plaintiffs objecting to officers not giving them time to get dressed before ushering them outside and respond that it would be unreasonable for officers confronting safety concerns to allow individuals to return to an un-cleared part of the house. *Id*. Second, they anticipate Plaintiffs arguing that their detention was unreasonable because of how Washington's nephew was treated; Defendants respond that the treatment of nonparties is irrelevant to the issue of these Plaintiffs' treatment. *Id*.

Plaintiffs, in response, argue that their detainment was unlawful because it was "unnecessarily prolonged, degrading, and involved an undue invasion of privacy." ECF No. 23 at 24. They argue that because the duration and location of the search were illegal, the seizure was illegal too. *Id*. Furthermore, they argue that Versey and Washington being held outside of their home shirtless and in sleeping attire, respectively, was unnecessarily degrading. *Id.* at 25.

For one, the Court has already established that Defendants permissibly entered into the residence and were permitted to engage in a protective sweep. *See supra* Sections 4.1.1 and 4.1.2. "An officer's authority to detain incident to a search is categorical; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.'" *Muehler v. Mena*, 544 U.S. 93, 98 (2005) (quoting *Michigan v. Summers*, 452 U.S. 692, 705 n.19 (1981)). That is, if an officer is justified in a search, the officer is justified in detaining those who might otherwise be in the way "for the duration of the search." *Id*. The Seventh Circuit has reiterated this position, recapitulating the Supreme Court's decisions as "recogniz[ing] limited situations at the scene of police activity in which it may be reasonable for police to detain people not suspected of

criminal activity themselves, so long as the additional intrusion on individual liberty is marginal and is outweighed by the governmental interest in conducting legitimate police activities safely and free from interference." *Howard*, 729 F.3d at 659 (citations omitted). In that same case, the Seventh Circuit concluded that police may detain non-suspects "to control the movement of those at the scene, to ensure that there was no interference, and to keep them out of any potential lines of fire." *Id*. Multiple cases across circuits have explicitly permitted limited detentions in the context of protective sweeps. See, e.g., *Sharp v. County of Orange*, 871 F.3d 901, 915 (9th Cir. 2017) ("[Officers'] tools might include detention of occupants to stabilize the situation while . . . conducting a lawful protective sweep of the premises."); *United States v. Maddox*, 388 F.3d 1356, 1362 (10th Cir. 2004) (concluding "that officer safety may justify protective detentions"); *Gomez*, 474 F. App'x at 57 ("Given the [plaintiffs]' concession that the protective sweep was a legal search, any seizures during that sweep would be valid under *Summers*.").

In light of this state of the law, the Court is satisfied that the fact of police's seizure of Plaintiffs conformed with the requirements of the Fourth Amendment. Police had probable cause to believe an armed gunman had just run into this couple's home; this makes "the concern for officer safety specific and strong." *Howard*, 729 F.3d at 660. As such, police were justified in detaining Plaintiffs in order to "secure the premises while the [sweep] was underway." *Bailey v. United States*, 568 U.S. 186, 195 (2013). They were entitled to do so for the duration of the sweep, and, as the Court has already discussed, *see supra* Section 4.1.2, the duration of the sweep was either outright permissible or subject to qualified immunity. Plaintiffs do not allege officers detained them for longer than the duration of the sweep.

And even if the Court were to assess the length of the detention on its own terms—that is, without reference to officers' right to detain Plaintiffs for the duration of the sweep—the Court would not find an unreasonable duration. *See, e.g.*, *Muehler*, 544 U.S. at 100 (finding that a "2– to 3–hour detention in handcuffs in this case does not outweigh the government's continuing safety interests."); *United States v. Bullock*, 632 F.3d 1004, 1011 (7th Cir. 2011) (finding a 30-to-40-minute investigative detention reasonable); *Los Angeles County, California v. Rettele*, 550 U.S. 609, 615 (2007); (permitting a detention where officers "left the home less than 15 minutes after arriving"). Thus, the length of the seizure was permissible, either on its own terms or as an extension of officers' permission to sweep the home. *See also Bullock*, 632 F.3d at 1018 (permitting a temporary seizure "to facilitate the orderly completion of the search").

The conditions of the seizure represent a somewhat separate inquiry. Plaintiffs contend the conditions were especially "degrading," insofar as Plaintiffs were not permitted to get dressed before being forced outside. ECF No. 23 at 25. The Court has located no case standing for the proposition that officers must allow occupants of a home time to get dressed before ushering them to a safer, less intrusive location when officers are undertaking a protective sweep. Indeed, the Court has located no case addressing a right to get dressed in a home search context at all. The Court therefore turns to cases like *Michigan v. Summers*, which recognize that "special circumstances, or possibly a prolonged detention," might render an otherwise reasonable detention impermissible. 452 U.S. 692, 705 n.21 (1981); *see also Rettele*, 550 U.S. at 614 ("Unreasonable actions include the use of excessive force or restraints that cause unnecessary pain or are imposed for a prolonged and unnecessary period of time." (citations omitted)). Such

special circumstances might include whether the detention is "unnecessarily painful, degrading, or prolonged, or if it involves an undue invasion of privacy." *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994). In *Franklin*, for instance, a detention was deemed unreasonable when officers removed a gravely ill man, who was not a suspect, from his bed, and required him to sit handcuffed for two hours, with his genitals exposed to twenty-three armed officers. *Id.* at 876-77.

The Court here finds that the detention was neither unnecessarily prolonged nor especially degrading. It is unfortunate that Plaintiffs were not permitted to dress in more comfortable clothing before being ushered out of the house. However, under the circumstances—most significant among them being officers' reasonable belief that an armed suspect was in the house—Defendants' decision to remove Versey and Washington from the house shirtless and in sleeping attire, respectively, was reasonable. Plaintiffs never left their porch, which is significant in the analysis. *Summers*, 452 U.S. at 702 (finding it significant that plaintiff faced "neither the inconvenience nor the indignity associated with a compelled visit to the police station."). There is no indication that Plaintiffs were handcuffed. Given that it was an August night, Plaintiffs likely did not experience (and, indeed, do not report experiencing) physical discomfort associated with being outside in various states of undress. There is no indication that Defendants prevented Plaintiffs from getting dressed "longer than necessary to protect their safety," *Rettele*, 550 U.S. at 615.

Overall, the Court finds that the seizure of Plaintiffs was reasonable, both in duration and in manner. It appears to have lasted just the duration of the sweep, a period of time for which officers are permitted to detain occupants, and it did not involve any particularly degrading or painful

behaviors. There is no genuine dispute of material fact, and summary judgment will be granted as to this claim.

### 4.2 Failure to Intervene

Plaintiffs' complaint states, "[b]efore the unlawful entry and search and seizure, Defendants Roembke, Franco and Jolliff had sufficient time and opportunity to intervene and confirm that the alleged suspect never entered [P]laintiffs' residence and could have easily prevented the unlawful entry, detention and search and prevented all the losses and damages as set forth herein . . . ." ECF No. 1-3 at 8. It is unclear if Plaintiffs only seek to establish liability for failure to intervene with respect to officers' initial entry into the home, but the Court will interpret the failure to intervene claim to apply to each of the disputed points of conduct.

Defendants, in their motion to dismiss, first respond that because there has been no constitutional violation, there can be no failure-to-intervene liability. ECF No. 20 at 17. Moreover, even if Plaintiffs can show a constitutional violation, Defendants contend that they cannot show that Roembke, Franco, or Jolliff *knew* one was occurring or was about to occur because they relied in good faith on Ebert's report. *Id*. (citing *United States v. Harris*, 585 F.3d 394, 400 (7th Cir. 2009)).

Plaintiffs, in response, argue that Roembke, Franco, or Jolliff failed to intervene to prevent the entry into Plaintiffs' home and that Jolliff failed to intervene to prevent the unlawful search. ECF No. 23 at 25. They contend that Jolliff, despite seeing officers open the cabinet, refrigerator, and freezer, "did not reprimand the officers or correct the scope of their search despite knowing a reasonable person could not have been hiding in some of these locations." *Id.* at 26. As to Jolliff, Franco, and Roembke, Plaintiffs contend that they failed to intervene by not asking Ebert how he concluded the

fleeing suspect entered Plaintiffs' home; instead, they relied implicitly on Ebert's report. *Id.* at 26–27.

The Court is constrained to dispose of this claim. As a general matter, a police officer who is present and fails to intervene to prevent another officer from infringing the constitutional rights of a citizen is liable under § 1983 if that officer had reason to know of the constitutional "that any constitutional violation has been committed by a law enforcement official; and the officer had a realistic opportunity to intervene to prevent the harm from occurring." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994) (citations omitted).

But as to the initial entry and the fact of a protective sweep, the Court finds no constitutional violation, so there can be no failure to intervene. And even as to the duration and manner of the sweep, the Court can find no failure to intervene. The purpose of qualified immunity is to "protect public officials from guessing about constitutional developments at their peril." *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009). It is meant to shield public officials from liability unless they violate clearly established rights "of which a reasonable person would have known." *Catlin v. City of Wheaton*, 574 F.3d 361, 365 (7th Cir. 2009). With that goal in mind, it strikes the Court as unreasonable to penalize the officers here for failing to intervene in a search whose length or manner may ultimately have been illegal but whose illegality was not clearly established. In other words, while there may have been a violation, it was not one of which a reasonable officer would have known, much less one they would have been trained on as a result of an on-point court case. Logically, since there was no "reasonable notice" that a search of this sort was illegal, officers also could not have known that the seizure incident to it was illegal and thus could

not be held accountable for failing to intervene. *Narducci v. Moore*, 572 F.3d 313, 318 (7th Cir. 2009). As a result, the Court will extend the qualified immunity from the protective sweep to cover the failure to intervene claim. *See, e.g., Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017) (failure to intervene claims failed where plaintiff's right to be free from certain interrogation tactics was not clearly established at the time); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ("If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful.").

### 4.3    Punitive Damages

Plaintiffs, in their complaint, seek punitive damages, alleging that the conduct was "unlawful, extreme, malicious, outrageous, and/or intentional." ECF No. 1-3 at 9. Defendants address punitive damages in their motion for summary judgment, ECF No. 16, stating there was an "absence [of] malicious intent, ill will or spite, and/or insufficient record evidence upon which a fact-finder could reasonably conclude these defendants acted with reckless disregard for Plaintiffs' rights." *Id.* at 1–2. Neither Defendants nor Plaintiffs address this point in their briefing for summary judgment. However, where all underlying claims have failed, even on the basis of qualified immunity, a claim for punitive damages cannot stand. *See, e.g., Cygnar v. City of Chicago*, 865 F.2d 827, 847 (7th Cir. 1989) ("entitlement to qualified immunity vitiates the jury's award of punitive damages"); *Wilson v. Layne*, 526 U.S. 603, 609 (1999) ("[G]overnment officials performing discretionary functions generally are granted a qualified immunity and are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known.'" (quoting *Harlow*, 457 U.S. at 818)). Thus, Plaintiffs' claim for punitive damages must be dismissed.

**5.      DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY**

Defendants also filed a motion to exclude testimony by Plaintiffs' expert, Scott J. Hilden. ECF No. 24. Because the case is being dismissed, this motion will be denied as moot.

**6.      CONCLUSION**

No claims have survived the Court's summary judgment analysis. Thus, for the reasons stated above, Defendants' motion for summary judgment will be granted.

Accordingly,

**IT IS ORDERED** that Defendants' motion for summary judgment, ECF No. 16, be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Defendants' motion to exclude expert testimony, ECF No. 24, be and the same is hereby **DENIED as moot**; and

**IT IS FURTHER ORDERED** that this case be and the same is hereby **DISMISSED with prejudice**.

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 19th day of March, 2026.

BY THE COURT:

J. P. Stadtmueller
U.S. District Judge